**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| K.W., an individual, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:22-cv-3845** |
| v. | : | |
| | : | **Judge Algenon L. Marbley** |
| RED ROOF INNS, INC., *et al.*, | : | |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| **Defendants.** | : | |

<u>**OPINION & ORDER**</u>

## I.    INTRODUCTION

This matter comes before the Court on Plaintiff K.W.'s Objection (ECF No. 93) to Magistrate Judge Deavers' March 4, 2026 Opinion and Order.  (ECF No. 87).  Plaintiff raises an important issue on a procedurally modest posture:  a Rule 72(a) objection.  The objection challenges the Magistrate Judge's interpretation of the parties' stipulated Protective Order protecting the true identity of K.W., who alleges that she was trafficked for sex at the Defendants' Red Roof Inn hotels.

This decision may resonate beyond the instant dispute.  The Court currently has approximately one hundred related sex trafficking cases pending before it.  In these cases, anonymous plaintiffs allege that they were victimized by human traffickers and sold for commercial sex at many hotels across the United States.  Across these cases, the parties work diligently to reach protective orders that balance two crucial and competing interests:  the protection of vulnerable civil plaintiffs, who allege horrific treatment in America's human trafficking epidemic, and the capacity of hotels to defend themselves from allegations that they benefitted from sex trafficking in violation of law.

The Court is sensitive to the concerns of K.W. and the Red Roof Defendants. This decision is informed by the record and the particular Protective Order negotiated between the parties. For the reasons that follow, Plaintiff K.W.'s Objection is **OVERRULED** and the Magistrate Judge's Opinion and Order is **AFFIRMED**. Defendants may disclose K.W.'s name and aliases to her alleged trafficker[1] to conduct a further investigation of her claims and develop their defenses.

## II.    BACKGROUND

K.W. is a resident of Toledo, Ohio. In October 2022, she sued the Ohio-based Red Roof Inns, Inc. and Red Roof Franchising, LLC anonymously, alleging that they had violated the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a). (Compl. ¶¶ 20–23, 25, 32).[2]

The Trafficking Victims Protection Reauthorization Act (TVPRA) sets forth certain criminal penalties for those who benefit from human trafficking. *See* 18 U.S.C. § 1591(a). The statute also provides a private right of action against the perpetrator and anyone who knowingly benefitted, or attempted to benefit, from participation in a venture with the perpetrator. *See id.* The requirements for liability under this beneficiary theory are: (1) the person or entity knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value; (2) from participating in a venture; (3) that the person or entity knew or should have known engaged in an act that violated 18 U.S.C. §§ 1581–97. 18 U.S.C. § 1595(a); *see, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio Oct. 7, 2019) (Marbley, J.); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023).

---

[1] The Court refers to K.W.'s alleged trafficker as her "trafficker" in shorthand.
[2] All reference to "Compl." or paragraph citations such as "(¶¶ __)" cite to K.W.'s Complaint (ECF No. 1) unless otherwise specified.

2

K.W. claims to have been trafficked for commercial sex at a Red Roof Inn in Kalamazoo, Michigan from February to October 2020, and at a Red Roof Inn in Toledo, Ohio in June 2020. She further alleges that the Defendants profited from what they knew was—or should have known was—her trafficking at their hotels.  (¶¶ 49, 58, 74).

### A.  The Protective Order

In June 2024, the parties submitted a proposed stipulated Protective Order regarding K.W.'s true identity.  (ECF No. 59).  The Court then entered that Protective Order.  (*See* ECF No. 76).  Under its terms, K.W. would provide Defendants with her true identity and identifying information, but would be "permitted to proceed pseudonymously[3] throughout the pre-trial course of these proceedings." (*Id.* at 1–2).  The Protective Order would also permit the parties to disclose K.W.'s true identity and identifying information to certain people, including witnesses.  Section 3(k) of the Protective Order governed when K.W.'s true identity and identifying information could be revealed to witnesses, but also incorporated procedural protections of Section 3(l) should a party seek to disclose K.W.'s true identity and identifying information to her trafficker.

**Section 3(k)**, governing the disclosure of this information to witnesses in general, provides, in relevant part:

> The Parties may disclose Plaintiff's True Identity to . . . Any potential, anticipated, or actual fact witness, and their counsel, but only to the extent Plaintiff's True Identity will assist the witness in recalling, relating or explaining facts—except Plaintiff's True Identity must not be disclosed to Plaintiff's known trafficker(s) . . . unless the parties follow the procedures in paragraph (l) below[.]

(*Id.* at 3).

---

[3] Though the dictionary rightly distinguishes anonymity from pseudonymity, courts often use the terms interchangeably where, as here, the distinction is without a difference. *E.g.*, *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000) ("[H]ere, pseudonyms are used to shield the anonymous party from retaliation . . ."); *Roe v. Univ. of Cincinnati*, 2018 WL 9944938, at *1 n.1 (S.D. Ohio Aug. 21, 2018) (Black, J.) (using the terms interchangeably); *Michael v. Bloomberg, L.P.*, 2015 WL 585592, at *2–3 (S.D.N.Y. Feb. 11, 2015) (same).

**Section 3(l)** applies when, as here, a party seeks to disclose this information to her trafficker. K.W.'s true identity and identifying information could be provided to her trafficker only following certain procedures:

> The Parties may disclose Plaintiff's True Identity to . . . Plaintiff's known trafficker(s) . . . but only to the extent Plaintiff's True Identity will assist the witness in recalling, relating or explaining facts; provided, however, that disclosure of Plaintiff's True Identity information is permitted only if the party requests and obtains a Court order before making any disclosure. The moving party must file a motion describing the circumstances to the Court. The motion shall not include any information revealing Plaintiff's True Identity and shall list only the reasons why Defendants [*sic*] believe it is necessary to reveal Plaintiff's True Identity to Plaintiff's alleged trafficker(s) or Plaintiff's trafficker's known associates. Before filing a contested motion, the parties must first meet and confer, and if they reach agreement, they may submit a stipulated motion to the Court requesting such an order.

(*Id.* at 3–4). Thus, a party seeking to disclose K.W.'s identity to her trafficker to aid the trafficker's "recalling, relating or explaining facts" would have to take several steps. *First*, that party must meet and confer to see whether the parties could reach an agreement and submit a stipulated motion to the Court. *Then*, if the parties could not agree, the party seeking disclosure would need to move for Court-ordered disclosure in a motion "describing the circumstances" of the requested disclosure. Perhaps because the parties anticipated that only the Defendants would move to reveal K.W.'s true identity or identifying information, the Protective Order requires that the party seeking disclosure must list "the reasons why *Defendants believe it is necessary* to reveal Plaintiff's True Identity to Plaintiff's alleged trafficker(s)." (*Id.* at 4) (emphasis added).

The emphasized necessity language is central to this dispute. But before turning to the dispute, the Court notes that the Protective Order contains only one other instance where it discusses necessity in disclosing K.W.'s true identity and identifying information. That necessity language occurs in Section 3(i), which concerns disclosures to the Government.

4

**Section 3(i)** applies in instances where a party seeks to disclose K.W.'s true identity and identifying information to:

> Government agencies and agency personnel, but only to the extent that the disclosure of Plaintiffs [*sic*] True Identity is *necessary* to litigate any claims or defenses or to comply with any obligations or requirements[.]

(*Id.* at 3) (emphasis added).

## B. The Dispute

### 1. K.W.'s Complaint Allegations

K.W.'s Complaint paints one picture of her relationship with her alleged trafficker, and the abuse she claims to have suffered at Defendants' hotels. According to her Complaint, her trafficker used "a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and deprivation of basic survival necessities" to hold K.W. "captive" and sell her for sex. (¶ 41). She alleges that her trafficker forced her to have sex with multiple men every day at Red Roof's hotels, and would violently attack her, beat her, and psychologically torment her by withholding food and water from her, to ensure she could not escape. (¶¶ 44–45).

In Kalamazoo, for instance, K.W. alleged that her trafficker "would stand outside of the door" as "K.W. would scream loudly for help," which were obvious signs of abuse "to the hotel staff and other guests at the hotel." (¶ 50). K.W. alleges further that during one stay, her trafficker "beat her up so badly that an ambulance came to the [hotel]. A staff member or guest called the police, who responded to the situation." (¶ 51).

### 2. K.W.'s Deposition Revelations

By contrast, K.W.'s deposition testimony paints a more nuanced picture of her alleged trafficking and her relationship with her trafficker. As Defendants characterize it, "several aspects

of [K.W.'s] testimony regarding her relationship with [her trafficker] call the allegations into question." (ECF No. 75 at 1).

The Red Roof Defendants deposed K.W. in July 2025. At her deposition, K.W. testified to important details regarding her relationship with her trafficker. She explained that she was in an intimate relationship with him for the entirety of her trafficking from February through October 2020, and they lived together during that time. (ECF No. 75-1 at 37–38; *see id.* at 266). She conceded that she lacked personal knowledge of any Red Roof Inn employees who knew about her trafficking, though she recalled an incident where she thought her trafficker intercepted someone who might have been a Red Roof employee responding to her screams. (*Id.* at 149–53).

K.W.'s trafficking ended in October 2020, when her mother picked her up and helped her leave. She was "tired of [her trafficker] using [her], using [her] body." (*Id.* at 39, 133). She returned to him weeks later, under the condition that she would not engage in commercial sex, to which he agreed—as she explained, her return was "under the conditions that you can't make me do that anymore. I was pregnant anyway. It was like you can't have me doing that. I'm not going to." (*Id.* at 133–34, 138–39).

Ultimately, K.W. stopped living with her trafficker in early 2021, sometime between March and May. By that point, she was "[j]ust tired of him" trying to get her to engage in commercial sex, noting that he had asked her to engage in commercial sex approximately three times in 2021 before she left. (*Id.* at 135, 137, 139–40). When she left her trafficker, she believes she left him with a red binder full of her written notes about her experiences from February to October 2020. (*Id.* at 164).

6

Later in 2021, K.W. gave birth to her fourth child, who is the son of her trafficker. (*Id.* at 163–64). In 2022, she reached out to her trafficker to ask for help with their son. (*Id.* at 101–02). When asked to reflect on whether her trafficker was a good father, she responded:

> Yes. . . . Outside of the sex trafficking and him trying to get me to do those things, he was a good person, and he—he probably would have been a good man. I just didn't know how to say no, and I'm still learning how to say no. I just thought that I was doing what the person who I loved and I thought he needed it—I thought he needed the money.

(*Id.* at 266). K.W. also clarified that from February to October of 2020, her trafficker would make her wait for food, but she was able to eat. (*Id.* at 141). And she explained that when she lived with her trafficker in 2021, he did not feed her or leave her money, but she worked at Wendy's and was able to eat. (*Id.* at 140–41).[4]

---

[4] As K.W. testified when asked about these time periods:

**Q:** And when you would say no [to engaging in commercial sex], did [your trafficker] act out in any way, like, get violent?
**A:** He would do things like not feed me, not leave me any money if I needed it. If I asked him for something, he would say no.
**Q:** But you were working at Wendy's, right?
**A:** Yes.
**Q:** So you had your own money, correct?
**A:** It wasn't his business. It wasn't his business what I had. I want what you have because you owe me.
**Q:** So it's not that you were unable to eat, you were just asking him to contribute –
**A:** Yeah.
Q: – to your life –
**A:** Yeah.
Q: – given you were pregnant with his child?
**A:** Right.
**Q:** Okay. But you were able to actually eat and –
**A:** Yeah.
**Q:** – provide for yourself? During February to October of 2020 did he ever restrict food or not allow you to eat?
**A:** You said during –
**Q:** February to October of 2020, the alleged trafficking period.
**A:** Oh. He would make me—I would say he would make me wait. He would make me wait . . .

### 3. *Defendants' Motion to Disclose*

In light of these revelations, and after a meet and confer, Defendants moved for permission to disclose K.W.'s true identity to her alleged trafficker to investigate her claims and prepare their defense.  As Defendants point out, K.W.'s trafficker is the only identified witness to her trafficking at the hotels, and thus, they may only be able to test the veracity of her claims by speaking with him.  (ECF No. 75 at 1).

In their motion, Defendants advance three arguments.  First, they claim they "should not have to rely solely on K.W.'s account and circumstantial evidence to form their defense."  (*Id.* at 2).  Doing so would, to Defendants, result in extreme prejudice and could undermine their ability to defend on a necessary element of Trafficking Victims Protection Rights Act, given the centrality of the facts surrounding K.W.'s relationship with her trafficker, their interactions, and his interactions with employees of the hotels.  (*Id.* at 4–9).  Second, they claim they lack evidence of the trafficker at their hotels, and thus would need to ascertain his presence with K.W.  (*Id.* at 9–10).  Finally, because K.W.'s allegations connect the hotel employees only to her trafficker, they claim that only her trafficker would be able to confirm or refute her allegations and know about the communications discussed.  (*Id.* at 11–12).

K.W.'s opposition argues that Defendants' attempt to reveal her identity to her trafficker would destroy the progress she had made in rebuilding her life, placing her and her child in danger. (ECF No. 77 at 1).  She advances several arguments.  First, she contends that Defendants have failed to show that disclosing her identity would be necessary.  Second, she argues that, counter to Defendants' position, there is no due process right for Defendants to depose her trafficker.  Third, K.W. believes that Defendants' line of questioning would be fruitless because her trafficker would simply invoke his Fifth Amendment rights.  Fourth, she argues that her interests outweigh the

Defendants', and the Court must balance these issues and compare the hardships under Rule 26(c)(1).  Finally, she requests an evidentiary hearing on these issues.  (*Id.* at 1–2, 6).

In reply, Defendants underscore that their request to depose K.W.'s trafficker is governed by Section 3(l) of the parties' Protective Order, and is crucial under the circumstances because they simply lacked other witnesses to question. (ECF No. 79 at 1).  They point out that their ability to investigate K.W.'s allegations hinges on what her trafficker might say, and note that K.W. cannot simply hypothesize that, based on her theory of the case, her trafficker would invoke his rights under the Fifth Amendment.  (*Id.* at 2–5, 7–8).  They also undermine K.W.'s claims of danger or hardship that might result, pointing out that K.W.'s own testimony establishes that after her alleged trafficking ended, she voluntarily reinitiated contact with her trafficker multiple times in multiple ways.  (*Id.* at 5–6).

### 4.  *The Magistrate Judge's Order*

The Magistrate Judge partially granted Defendants' request on March 4, 2026, allowing them to disclose K.W.'s true identity to her trafficker.  *K.W. v. Red Roof Inns, Inc.*, 2026 WL 607618, at *3 (S.D. Ohio Mar. 4, 2026) (Deavers, M.J.) (ECF No. 87).  Applying Section 3(l) of the Protective Order, the Magistrate Judge acknowledged K.W.'s concerns before concluding that disclosure was appropriate under the Protective Order, given that K.W.'s trafficker was the only person "*identified* as a witness to her trafficking," K.W.'s deposition revealed their relationship was "more nuanced" than her Complaint had alleged, and questioning her trafficker would be "relevant and necessary" for the Defendants to be able to defend against her claims.  *Id.* (emphasis added).  Without disclosure, Defendants would be unable to "test the veracity and accuracy of Plaintiff's claims." *Id.* at *2.  By contrast, K.W.'s arguments theorizing that deposing the alleged trafficker would be futile were "unpersuasive," but at any rate "irrelevant under the Protective

Order." *Id.* The Magistrate Judge also rejected Rule 26 as simply inapplicable when applying a stipulated Protective Order. *Id.*

### 5. *Plaintiff's Objection*

On March 25, 2026, K.W. objected to the Magistrate Judge's decision allowing Defendants to disclose K.W.'s true identity to her trafficker. (ECF No. 93). She raises three arguments, contending that the Magistrate Judge's decision: (1) was clearly erroneous by presuming that K.W.'s trafficker was the only witness to her trafficking; (2) was contrary to law in several ways, including by failing to engage in a Rule 26 analysis; and (3) will undermine the TVPRA's remedial purpose by deterring survivors of human sex trafficking from coming forward. (*Id.* at 2).

In response, the Defendants counter that K.W. had failed to surmount the high threshold for disturbing pretrial orders issued by magistrate judges on non-dispositive matters. They argue that the Magistrate Judge did not commit legal error or make a clearly erroneous factual determination, and reject K.W.'s remedial purpose argument as a policy argument that simply has no bearing in this procedural posture. Defendants also contend that because Rule 26 governs motions for protective orders, it is simply inapplicable when it comes to interpreting protective orders that are already in place. (*See* ECF No. 94 at 5–7).

### III. STANDARD OF REVIEW

Objections to a magistrate judge's orders on non-dispositive issues are governed by Federal Rule of Civil Procedure 72(a), which implements 28 U.S.C. § 636(b)(1)(A). Under Rule 72(a), a court "must consider timely objections and modify or set aside any part of [a magistrate judge's] order that is clearly erroneous or is contrary to law" when it concerns "a pretrial matter not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). The clearly erroneous standard

10

applies to the magistrate judge's factual findings, in light of the considerable deference that Rule 72(a) provides to the magistrate judge's determinations. *Hunter v. Booz Allen Hamilton, Inc.*, 2021 WL 2410378, at *2 (S.D. Ohio June 14, 2021) (Marbley, J.). A magistrate judge's factual finding is "clearly erroneous" only when, after reviewing the evidence, the district court is left with the definite and firm conviction that a mistake has been committed. *Id.* Meanwhile, the district court will overturn the magistrate judge's legal conclusions only where those conclusions "contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent." *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd*, 19 F.3d 1432 (6th Cir. 1994) (cleaned up).

## IV. LAW AND ANALYSIS

The Court will consider each of K.W.'s objections in turn. But first, a threshold issue precludes K.W. from making several arguments. When Defendants moved to disclose, K.W. filed a succinct, six-page opposition brief. After receiving an unfavorable ruling, K.W. objected across a sprawling, twenty-page brief, raising issues that she had not placed before the Magistrate Judge. Naturally, the Magistrate Judge could not have considered these arguments. *See Graham Packaging Co. v. Indorama Ventures Alphabet Holdings, Inc.*, 2024 WL 4793739, at *2 (W.D. Ky. Nov. 14, 2024). "Rule 72(a) precludes the district court from considering factual arguments and evidence that was not presented to the magistrate judge, and new arguments and factual assertions cannot properly be raised for the first time in objections to a magistrate [judge's] discovery order, and indeed may not be deemed objections at all." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 336 F.R.D. 400, 403–04 (S.D.N.Y. 2020) (cleaned up; citations omitted).

11

K.W. has forfeited issues "not actually presented to the Magistrate Judge." *AES-Apex Emp. Servs., Inc. v. Rotondo*, 924 F.3d 857, 867 (6th Cir. 2019) (cleaned up); *see Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019) ("parties are precluded from raising 'new arguments or issues that were not presented to the magistrate [judge]'") (quoting *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000)); *cf. Murr*, 200 F.3d at 902 n.1 (characterizing this as a matter of waiver). That precludes such arguments from being raised now. For these arguments, the Court will still explain why they would fail on the merits if they had not been forfeited.

## A. The Magistrate Judge's Findings of Fact Were Not Clearly Erroneous

The Magistrate Judge determined that K.W.'s alleged trafficker was "the only person Plaintiff has identified as a witness to her trafficking." *K.W.*, 2026 WL 607618, at *1. Defendants argued before the Magistrate Judge that K.W.'s trafficker was the "only witness" to her alleged trafficking. (ECF No. 75 at 1). In opposing Defendants' motion, K.W. only advanced arguments regarding the balance of harms and futility. (ECF No. 77 at 5–6). She did not offer other witnesses beyond her trafficker, nor did she counter Defendants' assertion that her trafficker was the only witness to her trafficking she could identify. (ECF No. 75 at 12) (describing K.W.'s trafficker as "the only witness to K.W.'s trafficking whom K.W. has identified").

Now, K.W. posits that the Magistrate Judge's factual findings were "unequivocally contradicted by the evidence in the record" and thus were erroneous, because they accepted the Defendants' factually unsupported statement that K.W.'s trafficker was the only witness to her trafficking. (ECF No. 93 at 16).

This argument fails for multiple reasons. First, this argument fails because K.W. never made it before the Magistrate Judge. Thus, K.W. forfeited this argument. *See Rotondo*, 924 F.3d at 867; *Bisig*, 940 F.3d at 219. Even if the Court were to reach the merits of this issue, however,

12

it would not disturb the Magistrate Judge's determination. K.W. selectively quotes the Magistrate Judge's decision and conveniently overlooks the third sentence in the Magistrate Judge's analysis, which noted that K.W.'s trafficker was the only *identified* witness. K.W. attempts to counter this only by offering unknown individuals based on her deposition, but she does not identify any of these individuals. (ECF No. 93-4 at 1) ("They [Red Roof] knew. They knew what was going on. They know what's happening to those girls."). The Court cannot say it is left with the definite and firm conviction that the Magistrate Judge erred in evaluating the facts in the record. K.W.'s factual challenge is insufficient procedurally, but would fail on its merits had it not been forfeited.

**B. The Magistrate Judge's Applicable Conclusions of Law Were Not Contrary to Law**

K.W. also argues that the Magistrate Judge's decision was contrary to law because it failed to apply Federal Rule of Civil Procedure 26(c)'s standards, misinterpreted the Protective Order's language and conflated "necessity" with "relevance," and misstated the law under the TVPRA. The Court considers each argument, *de novo*, in turn.

### 1. *Rule 26's Applicability*

The Magistrate Judge addressed the disclosure of K.W.'s identity to her trafficker by applying the terms of the parties' Protective Order, explaining that K.W. had "fail[ed] to articulate why the Court should apply [Rule 26] factors considered when determining whether to issue a protective order instead of the plain language of the parties' stipulated Protective Order." *K.W.*, 2026 WL 607618, at *1–2. K.W. did raise this argument before the Magistrate Judge, (*see* ECF No. 77 at 4–6), so she has not forfeited it.

K.W. asserts that the Magistrate Judge committed legal error by interpreting the Protective Order by its plain terms "without any reference to the governing legal standard." (ECF No. 93 at 6). She proposes, consistent with her opposition to Defendant's motion, that the Magistrate Judge

should have read the Protective Order in light of Rule 26(c). In opposing K.W.'s objection, Defendants agree with the Magistrate Judge that Rule 26(c) applies to motions for protective orders, not the interpretation of issued protective orders. (ECF No. 94 at 8–9). Alternatively, Defendants contend that the Magistrate Judge's decision reflected the appropriate Rule 26(c) balancing analysis, and should be sustained on that ground. (*Id.* at 9–10).

Federal Rule of Civil Procedure 26 governs discovery and disclosures. It also allows for a party to move for, and a district court to issue, a protective order. Fed. R. Civ. P. 26(c)(1). Thus, Rule 26(c) not only "contemplates," *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 929 (6th Cir. 2019), but provides the procedure for district courts to, in exercising their discretion, "issue protective orders." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 227 (6th Cir. 1996); *see generally* 8A Wright & Miller's Federal Practice & Procedure § 2036 (3d ed. 2026) (Rule 26(c) "emphasizes the complete control that the court has over the discovery process. . . . The rules . . . permit the broadest scope of discovery and leave it to the enlightened discretion of the district court to decide what restrictions may be necessary in a particular case."); *see also* Nora Freeman Engstrom, *et al.*, *Secrecy by Stipulation*, 74 Duke L. J. 99, 114–15 (2024) (observing that the Sixth Circuit has interpreted Rule 26 to limit district court discretion when *entering* a protective order).

By its terms, Rule 26 governs requests for, and issuances of, protective orders. It does not discuss the interpretation of already-issued protective orders. Moreover, K.W. has failed to provide any binding or persuasive authority explaining why Rule 26(c) would apply to the interpretation of an already-issued protective order, either in opposing the Defendants' motion or in support of her objection to the Magistrate Judge's decision. The parties do not address case law on this issue, but federal courts appear unanimous in examining protective orders based on their "plain language." *Moore v. Ford Motor Co.*, 755 F.3d 802, 806 (5th Cir. 2014); *see also United*

14

*States ex rel. Fisher v. Boyd & Assocs.*, 2025 WL 3063607, at *2 (5th Cir. Nov. 3, 2025) ("The 'textual interpretation' of a protective order 'is ultimately a legal question.'"); *SEC v. Merrill Scott & Assocs., Ltd.*, 600 F.3d 1262, 1271 (10th Cir. 2010) ("The starting point for interpretation of a protective order lies in its plain language."); *cf. Doe v. Ohio State Univ.*, 2024 WL 3687871, at *2 (S.D. Ohio Aug. 7, 2024) (Deavers, M.J.) (resolving dispute surrounding proposed protective order based on "language" of the court's "exemplar one-tier protective order").  In this way, Rule 26-issued protective orders are interpreted like contracts.  The general principles of contract law govern, and courts give deference to the plain meaning of the text and the normal usage of its terms.  *See City of Hartford v. Chase*, 942 F.2d 130, 134–35 (2d Cir. 1991) (addressing court-approved confidentiality order).

K.W. has offered "no binding case law . . . in favor of [her] position," *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 238 (6th Cir. 2016), which runs contrary to the language of Rule 26 and the weight of authority.  The Court finds that the Magistrate Judge did not commit legal error by interpreting the parties' Protective Order based on its terms.  The Court need not and does not reach the Defendants' alternative argument that the Magistrate Judge appropriately balanced Rule 26(c) considerations.

### 2.  *Terms of the Protective Order*

As the Court's analysis of K.W.'s Rule 26 objection presages, analysis of a Protective Order turns on its terms.  Thus, K.W.'s second legal objection—to the relevant terms—is central.  The Magistrate Judge determined, after reviewing the terms of the Protective Order, that revealing K.W.'s identity to her trafficker would be relevant and necessary for the defense under the circumstances.  *K.W.*, 2026 WL 607618, at *1–2.  K.W. did not forfeit this argument.  (*See* ECF No. 77 at 5).

15

*a. Necessity*

K.W. argues that the Magistrate Judge misinterpreted and misapplied the plain language of the Protective Order by failing to apply the Protective Order's language and by conflating "necessity" with "relevance." (ECF No. 93 at 8–9). K.W. first asserts that the Court erroneously focused on the first part of Section 3(l) of the Protective Order (allowing disclosure), without considering the exceptions to disclosure in the second part of Section 3(l). (*Id.* at 9). She then argues that the Magistrate Judge conflated "necessary" and "relevant" under the terms of the Protective Order and could not have found actual necessity based on Defendants' arguments. (*Id.* at 10–14). Defendants counter that K.W.'s arguments "amount[] to nothing more than an attempt to rewrite the Parties' agreement and graft additional procedural requirements onto the Stipulated Protective Order—requirements that do not appear in the text of the Order itself." (ECF No. 94 at 10).

As a legal matter, parties to a protective order are "bound by [the protective order's] terms." *Merrill Scott*, 600 F.3d at 1274; *see* Section IV(B)(1), *supra*. K.W. and the Defendants appear to agree on this point. A *de novo* review of the Protective Order and the Magistrate Judge's decision demonstrates why K.W.'s objection lacks merit.

The parties do not dispute that Section 3(l) of the Protective Order governs. That provision allows a party to disclose K.W.'s true identity and identifying information to her trafficker "only to the extent [K.W.'s true identity and identifying information] will assist the witness in recalling, relating or explaining facts. (ECF No. 76 at 3–4). Before this disclosure can happen, however, Section 3(l) establishes several requirements. *First*, the party seeking to disclose the information must "request[] and obtain[] a Court order before making any disclosure." (*Id.* at 4). *Second*, that request for a Court order must be in the form of "a motion describing the circumstances to the

16

Court." (*Id.*).  The motion must omit information that could identify K.W., and is required to "list only the reasons why Defendants [*sic*] believe it is necessary to reveal [K.W.'s true identity and identifying information] to [her] alleged trafficker(s)." (*Id.*).  *Third*, if the motion is contested, the parties must meet and confer.  (*Id.*).

Nothing in Section 3(l) requires that the Court find "necessity" exists before ruling for the movant.  Rather, Section 3(l)'s plain text establishes that the movant must only establish that disclosure "will assist the witness in recalling, relating or explaining facts." (*Id.* at 3–4).  To do so, the movant must satisfy several procedural requirements, including listing the reasons why the movant "*believes* it is necessary to reveal" the information.  (*Id.* at 4) (emphasized verb's plurality altered).[5]  In their motion, the Defendants clearly articulate why disclosure is necessary, explaining that K.W.'s trafficker was the only identified witness to her alleged trafficking.  (ECF Nos. 75 at 1, 12; 79 at 1).  Defendants assert that K.W.'s trafficker would be "unable to testify about his relationship with K.W., their stays at the [Red Roof] Inns, his interaction with her at the [Red Roof] Inns, and his interaction with employees at the [Red Roof] Inns when he was staying with K.W." without knowing her identity.  (ECF No. 75 at 5).  All of this information would be relevant to the Defendants' investigations, ensuring that any testimony from K.W.'s trafficker addressed their relationship and the circumstances of K.W.'s trafficking.  (*Id.* at 5–6).  But the terms of the Protective Order left it to the Court whether disclosure should be granted after Defendants *argued* necessity.[6]

---

[5] The text of the Protective Order is unclear as to whether only the Defendant must make such a necessity showing, as the language switches from talking about a "moving party" to "Defendants." Ultimately, that inconsistency is immaterial here, because the moving parties are the Defendants.
[6] Although the parties do not address this point, a contrast with the language found in Section 3(i) lends further credence to the conclusion that Defendants need not show actual necessity here to disclose K.W.'s identity to her trafficker under Section 3(l).  Section 3(i) expressly provides that K.W.'s true identity and identifying information could be disclosed to "Government agencies and

17

### b. Futility

The terms of the Protective Order are why K.W.'s futility argument fails, too. K.W. argues that her trafficker would likely invoke the Fifth Amendment, "making the deposition futile." (ECF No. 93 at 13). But this has no bearing on the interpretation of the Protective Order. The Magistrate Judge found these arguments to be unpersuasive and irrelevant, *K.W.*, 2026 WL 607618, at *2, and the Court agrees. K.W. seeks to circumvent disclosure based on her read of her trafficker's situation. This argument is not grounded in the terms of the Protective Order, and at any rate is meritless as a matter of law.

The Fifth Amendment privilege[7] "must be asserted *by [the] witness* with respect to particular questions," and "cannot be claimed in advance of the questions." *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983) (emphasis added). K.W. argues based on the purported Fifth Amendment rights of others—not her own rights. Her reliance on *United States v. Bates* is unavailing. *Bates* stands for a narrow proposition: "when a defendant has a clear entitlement to claim the privilege" in a criminal case, "forcing the defendant to take the stand is 'futile' and thus unnecessary." *United States v. Bates*, 552 F.3d 472, 476 (6th Cir. 2009). But this is a civil case, not a criminal one. In civil cases where a deposition is sought, "the availability of the privilege is not a ground for vacating the notice of the deposition. The proper procedure is for the deponent to attend the deposition, to be sworn under oath, and to answer those questions he or she can answer without running a risk of incrimination." 8 Wright & Miller's Federal Practice & Procedure § 2018 (3d ed. 2026).

---

agency personnel . . . only to the extent that the disclosure . . . is *necessary* . . ." (ECF No. 76 at 3) (emphasis added). This language requires a showing of actual necessity, rather than a party's belief of necessity.

[7] "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.

The Magistrate Judge specifically considered Defendants' proffered necessity reasons in granting their motion. *K.W.*, 2026 WL 607618, at \*1. K.W.'s objection fails to show how any part of the Magistrate Judge's careful decision misinterpreted or misapplied the terms of the Protective Order or erred in construing the Fifth Amendment privilege. Protective orders "must be interpreted to comply with common sense," connecting their prohibitions to their purposes. *Static Media LLC v. Leader Accessories LLC*, 38 F.4th 1042, 1048 (Fed. Cir. 2022). K.W.'s interpretation of her Protective Order would "produce a result that makes no or little sense," counseling against her interpretation. *Boyd & Assocs.*, 2025 WL 3063607, at \*3 (citations omitted). If K.W.'s allegations of other witnesses or testimony about unidentified others who "knew" about her trafficking, (ECF No. 93 at 17), could render Section 3(l) of the Protective Order inapplicable, the burden that the Protective Order would place on the Defendants' ability to investigate would not merely be "considerable." *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 551 (6th Cir. 2004). It would be functionally insurmountable. Additionally, if a trafficker's Fifth Amendment right to remain silent could be invoked by their purported victim to circumvent the trafficker's testimony in a civil case, there might be no need for a protective order governing disclosures to the trafficker at all.

After a careful *de novo* review, the Court upholds the Magistrate Judge's decision and concludes that the disclosure of K.W.'s identity under these circumstances is permissible by the terms of the Protective Order.

### 3. *Law of the TVPRA*

K.W. also contends that the Magistrate Judge "misstate[d] the law under the TVPRA, opining the discovery was necessary because Red Roof needed to be able to connect K.W. and her trafficker *at Red Roof at the same time to constitute a venture*[,] and further accept[ed] that the

19

TVPRA requires proof of a sex trafficking venture *specific* to the sex trafficking of K.W., which is contrary to law." (ECF No. 93 at 14). K.W.'s objection here is unclear—she appears to conflate the Magistrate Judge's decision with Defendants' position before the Magistrate Judge, and at any rate she fails to identify where the Magistrate Judge actually erred as a matter of law. Indeed, the Magistrate Judge's decision carefully considered the need for disclosure in light of *K.W.'s own claims* regarding her alleged trafficking. *See K.W.*, 2026 WL 607618, at *1–2 (citing, *inter alia*, ECF No. 1 ¶¶ 49, 58 (K.W.'s specific allegations regarding her trafficking at the subject hotels)).

Regardless, as discussed in Section IV(B)(2), *supra*, the terms of Section 3(l) of the Protective Order govern. There is an "overriding policy" favoring the enforcement of the terms of a civil protective order once it is entered. *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296–97 (2d Cir. 1979). "The parties['] justified reliance on the terms of the protective order will be undermined by any retroactive rewriting of its terms, which this court is not authorized to do and will not do." *Boulter v. Noble Energy, Inc.*, 2025 WL 947480, at *5 (D. Colo. Mar. 28, 2025). In sum, K.W.'s TVPRA objections miss the mark because they fail to engage with the Magistrate Judge's decision, which applied the terms of the Protective Order to the case that K.W. has presented. The Court finds no reason to disturb the Magistrate Judge's decision on these grounds.

### C. Plaintiff's Remedial Purpose Argument is Unavailing

K.W. also argues that the Magistrate Judge's decision "fails to consider the remedial purpose of the TVPRA." (ECF No. 93 at 18). In essence, K.W. argues that disclosing her identity would contravene the spirit of the Protective Order and undermine Congressional intent in creating a civil remedy for victims of sex trafficking through the TVPRA. (*Id.* at 18–20). She suggests that other survivors of commercial sex trafficking will be less likely to come forward. Although the Court is sympathetic to K.W.'s concerns, recognizing that her deposition testimony has

20

revealed the "complexity of her relationship with her trafficker," (*id.* at 19), her remedial purpose argument fails for several reasons. Again, as a threshold matter, K.W. did not advance this argument before the Magistrate Judge, and thus forfeited it. *See Rotondo*, 924 F.3d at 867; *Bisig*, 940 F.3d at 219.

But even on the merits, K.W's argument fails. Across these TVPRA cases, there is a fundamental tension between the need to provide for plaintiff safety while affording the defendants a fair ability to defend themselves. The parties' Protective Order addressed that tension, and was negotiated and stipulated to by K.W., through counsel, in light of her TVPRA claims. Its terms govern and this Court will not rewrite them. In essence, K.W. provided for the procedural mechanism that she now seeks to avoid. Her "*in terrorem* effect" argument falls flat considering the Protective Order's origin, and the circumstances that came to light in K.W.'s deposition testimony undercut the threat she claims. It is true that if K.W. were to withdraw her case to avoid disclosure of her identity to her trafficker, such a withdrawal would "cut off a claim that, if proven, is obviously one of great civil wrong." *James v. Jacobson*, 6 F.3d 233, 242 (4th Cir. 1993). But the Court has granted her anonymity in these proceedings, and she stipulated to the terms of the Protective Order. Should she elect to withdraw her case, that is her choice to make. It cannot be a surprise to K.W. that her trafficker may be contacted regarding her identity,[8] particularly when she agreed to a Protective Order contemplating as much. *See M.A. v. Wyndham Hotels & Resorts,*

---

[8] In her Complaint, K.W. asserted that her anonymity was required "because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed," and noted that she "should not be compelled to disclose her identity in order to maintain her privacy and safety." (¶¶ 21(c)–(d)). She conceded that Defendants "will not be prejudiced. . . . Plaintiff simply seeks . . . assurances that [Defendants] will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects." (¶ 21(e)).

21

*Inc.*, 2020 WL 5417560, at \*4 (S.D. Ohio Sept. 10, 2020) (Deavers, M.J.) ("[T]he Court . . . also questions the likelihood that the prospect of Defendants' contacting her trafficker(s) is only recent news to Plaintiff.").

Given the parties' agreement and stipulation to the Protective Order, the Court will not entertain arguments about the TVPRA's purpose that would serve to undermine or eviscerate that Protective Order. K.W. agreed the Protective Order would govern her TVPRA claims in this litigation.

## V. CONCLUSION

As Justice Ginsburg aptly observed, the American tradition provides parties to a lawsuit a "full and fair opportunity to litigate" the matter, as "everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008). A plaintiff's anonymity can, in some cases, generate a risk unfairness to the defendant. *See generally* Eugene Volokh, *The Law of Pseudonymous Litigation*, 73 Hastings L.J. 1353, 1379–80 (2022). But the parties' Protective Order addressed that the risk.

The Court is sensitive and sympathetic to the concerns of K.W. and other plaintiffs in its TVPRA cases. But permitting Defendants to depose K.W.'s alleged trafficker using her real name, based on the terms of the Protective Order, safeguards the ability of the Defendants to investigate K.W.'s claims and actually defend themselves. K.W. has made serious allegations against the Defendants, and there are no other identified witnesses to her trafficking. The terms of the Protective Order contemplate disclosure of K.W.'s true identity and identifying information to her alleged trafficker in such circumstances. This approach accords with the sense of fundamental fairness that is at the core of the American legal system. *Compare Publius v. Boyer-Vine*, 321 F.R.D. 358, 365 (E.D. Cal. 2017) (prejudice results "where a plaintiff's anonymity interferes with

22

the defendant's ability to address specific allegations against it or is logistically impractical"); *with*

*Doe 1 v. George Washington Univ.*, 369 F. Supp. 3d 49, 67 (D.D.C. 2019) (observing that there

may be "little to no risk of unfairness . . . where discovery does not appear to be inhibited by the

plaintiff's desire to proceed anonymously").

Considering the terms of the Protective Order, the Magistrate Judge's decision, and the

governing law, the Court must **OVERRULE** Plaintiff K.W.'s Objection and **AFFIRM** the

Magistrate Judge's Opinion and Order.  Any other holding would risk allowing K.W. to use the

Protective Order to "simultaneously [serve] as a shield to protect her privacy" and "as a sword" to

unilaterally dictate the facts of the case.  *Evans v. Robertson*, 2025 WL 2737446, at *3 (E.D. Mich.

Sept. 25, 2025).

      **IT IS SO ORDERED.**

                                  **ALGENON L. MARBLEY**
                                  **UNITED STATES DISTRICT JUDGE**

**DATED:  June 4, 2026**